UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**SEAN L. HARTFIELD**,                                    Civil Case No. 3:11-CV-00100-KI

                    Plaintiff,                            OPINION AND ORDER

        v.

**LEO BESNER, individually, WILLIE
HALLIBURTON, SGT. PETER
MAHUNA, CITY OF PORTLAND, a
political subdivision of State of Oregon,
and John Doe Supervisors #1-5**,

                    Defendants.


        Sean L. Hartfield
        Hartfield Law Offices PC
        6019 NE MLK Jr. Boulevard
        Portland, OR 97211

                Pro Se Plaintiff


Page 1 - OPINION AND ORDER

J. Scott Moede
Senior Deputy City Attorney
Office of City Attorney
1221 SW Fourth Avenue, Rm. 430
Portland, OR 97204

      Attorney for Defendants

KING, Judge:

Plaintiff Sean L. Hartfield brings an action under 42 U.S.C. § 1983 and state law alleging defendants Leo Besner, Willie Halliburton, Sergeant Peter Mahuna, and the City of Portland violated his civil rights and acted in a tortious manner. Pending before me is defendants' Motion for Summary Judgment Regarding Plaintiff's First Amended Complaint [48].[1] For the following reasons, I deny the motion in part and grant in part.

## BACKGROUND

I.    <u>Claims</u>

Hartfield owns a consignment store in Portland. He alleges claims against Officer Leo Besner and Sergeants Willie Halliburton and Peter Mahuna, three City of Portland police officers who responded to a 9-1-1 call that witnesses placed during an altercation between Hartfield and a customer, Danny Bell, at Hartfield's store. Because Hartfield alleges violations of his Fourth Amendment rights (arrest without probable cause), violation of his Fifth Amendment rights (right to silence and counsel), and failure to supervise, as well as false imprisonment, I have set forth the undisputed facts as the police officers learned them. Hartfield has also alleged a claim

---

[1]The Court granted plaintiff permission to file a First Amended Complaint after defendants had already filed a Motion for Summary Judgment against the initial Complaint. The Motion for Summary Judgment [26] is, accordingly, moot.

against the City of Portland for custom, policy or practice of condoning unconstitutional conduct, but that claim has been bifurcated by a previous order.

Hartfield conceded a handful of his claims during oral argument on defendants' motion. Specifically, he conceded that given Sergeant Halliburton's extremely limited role at the scene, both in responsibility and time, he should be dismissed.  Additionally, Hartfield conceded his excessive force and related battery claims should be dismissed because he did not experience any damage to his hands or wrists as a result of the handcuffing, never complained to the officers about the tight handcuffs, and never asked that the handcuffs be removed.  Cf. Wall v. Cnty. of Orange, 364 F.3d 1107, 1112 (9th Cir. 2004) (officer refused to loosen handcuffs; damaged wrists); LaLonde v. Cnty. of Riverside, 204 F.3d 947, 960 (9th Cir. 2000) (refused to loosen handcuffs); Alexander v. Cnty. of L.A., 64 F.3d 1315, 1323 (9th Cir. 1995) (police initially refused to readjust handcuffs; hand remained numb nine months after being handcuffed); Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) (police refused to loosen handcuffs; left bruises); Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989) (bruises on wrist).[2]

Accordingly, the remaining questions are whether defendants detained or arrested Hartfield, and, if they arrested Hartfield, whether they had probable cause to do so.  Additionally, Hartfield argues that defendants violated his right to counsel and silence, and asserts Sergeant Mahuna improperly supervised Officer Besner.  Finally, a question remains as to whether the officers are entitled to qualified immunity.

---

[2]If plaintiff had not conceded these issues, I would have ruled in favor of defendants on them.

II.    <u>Facts</u>

The 9-1-1 call that triggered police presence at Hartfield's consignment store, located at 6019 NE Martin Luther King Jr. Blvd. ("MLK"), first reported a stabbing at the corner of Ainsworth and MLK in North Portland.  When the 9-1-1 operator asked who was stabbed, the caller reported, "A gentleman.  Another gentleman is holding him down right now.  It's two gentlemen and they have a gun."  Moede Aff. Ex. 13, at 3.  The operator asked who had the gun. The caller reported, "There's a gun and he is being detained by two civilians at the corner of Ainsworth and MLK in front of the Starbucks."  <u>Id.</u>  The caller did not know the men.  The 9-1-1 operator then asked who got stabbed, and the caller reported that no one had been stabbed and "[s]omeone grabbed the knife out of his hand and there is a gun[.]"  <u>Id.</u> at 4.  The caller reported that the man with the gun was a black male wearing jeans and a light blue button-down shirt. She described the other man as wearing a suit.

Dispatch transmitted the following message at 11:49:

DISPATCH:  For you and 660 [Officer Besner's car] going with medical Northeast Ainsworth and MLK.  Two civilians are holding down a suspect who stabbed someone else.  One subject has a gun and now the caller is actually saying no one was stabbed, but there are three subjects somehow involved.

. . .

660:  660.  Did I copy that right, somebody has a gun?

DISPATCH:  Sounds like there's some confusion.  Caller was first saying someone was stabbed.  Now they're saying no one is stabbed, but there may be a gun involved somehow.

. . .

DISPATCH:  Copy.  I'll show you en route.  Then for everyone en route to Ainsworth and MLK, it looks like the subject with the gun is a black male, light blue button-down shirt and blue jeans.

Id. at 7.

Officer Zachary Edner arrived first at 11:50:16.  Hartfield explained to Officer Edner, pointing at Bell, "I own this store, and he refused to leave, then assaulted me with a knife." Hartfield Decl. ¶ 6; Edner Dep. 35:15-16 ("Yeah, I think you had told me that he was the one that had the knife.  So I wanted to control him.")  When Officer Besner arrived less than a minute later, at 11:51, he saw Officer Edner speaking with the man in the suit while holding the man's hands behind his body; the man turned out to be Bell.  Officer Edner asked the crowd who had the knife, and they pointed at Bell.  Officers Edner and Besner handcuffed Bell.  Bell yelled, "He's got a gun," pointing at Hartfield.  Hartfield Decl. ¶ 7.

Officer Besner then approached Hartfield, noticing that the shirt matched the description of the shirt of one of the men he was told was involved in the fight.  Officer Besner asked Hartfield to turn and lace his fingers behind his head so Officer Besner could secure the gun. Hartfield complied.  Officer Besner handcuffed Hartfield's hands above his head, removed Hartfield's gun from the holster and handed it to another officer.  Officer Besner removed Hartfield's wallet from his pocket and began searching for the license to carry a concealed weapon.  Several other armed police officers stood nearby.

Officer Besner found Hartfield's driver's license and the concealed weapons license. After he examined the documents, he asked Hartfield what happened.  Hartfield asked if Officer Besner could remove the handcuffs or at least step inside the consignment shop to hear Hartfield's statement.  Officer Besner refused.  Hartfield said he owned the shop and that

standing around in handcuffs surrounded by police officers could hurt his business.  Officer

Besner refused.  A customer, Skye McKay, remembered "trying to explain–I don't remember if I

did it in advance or before they grabbed [Hartfield].  But I was saying, This guy's a merchant.

He's the good guy.  The other guy is the bad guy.  He's the one that attacked [Hartfield]."

McKay Dep. 16:20-24; see also Hartfield Decl. ¶11 (same recollection).  She thinks she said this

when Officer Besner started putting Hartfield in handcuffs.

       Hartfield became confused about why he was in handcuffs and asked if he was under

arrest.  Officer Besner responded that Hartfield was not under arrest but was being held for

questioning.  Hartfield said that, under the circumstances, he wanted an attorney present before

discussing the situation further.  Officer Besner still had Hartfield's driver's license and

concealed handgun license.  Officer Besner then unlocked the handcuffs, twisted Hartfield's

hands behind his back, and placed the handcuffs on Hartfield again in a much tighter fashion.

Officer Besner testified that he placed Hartfield in handcuffs because he was "involved in a fight

and [he was] armed with a gun."  Besner Dep. 34:18-22.

       Officer Besner placed Hartfield in the back of the police car.  Hartfield complained that

the space was too cramped; his knees were in pain.  Officer Besner left for a few minutes, then

returned, read Hartfield his Miranda rights, and left again.

       Officer Besner did not interview any witnesses at the scene, but he spoke with Officer

Edner and Sergeant Mahuna who had obtained several witness statements.  Officer Besner

reported, "There were several witness statements describing an initial verbal exchange between

Bell and Hartfield inside the store.  Bell was asked to leave and refused.  Hartfield asked the

customers in the store to leave.  After they left the fight started.  There were no direct witnesses

to the start of the fight." Moede Aff. Ex. 1, at 4. Officer Edner had spoken with witness Grey

Magauran who reported that Hartfield and Bell were "having a heated verbal argument" in the

store, that Hartfield told Bell to leave the store several times, and that Bell refused to leave.

Edner Dep. 40:13-17. She reported that Hartfield asked the customers to leave the store, and the

customers did so. She also reported to Officer Edner that she was concerned about Hartfield's

safety and stayed near the shop.

Officer Besner returned to the police car with another officer who told Hartfield that he

could get out of the police car and the handcuffs if he would just make a statement. Hartfield

refused to make a statement without an attorney present. Officer Besner then sat in the front of

the car and called in Hartfield's driver's license and gun serial number. He tried to talk with

Hartfield, who informed the officer that he did not wish to speak without an attorney present.

Hartfield became more and more agitated and swore at Officer Besner.

Sergeant Mahuna tried to talk with Hartfield in the car. He testified that he told Hartfield

on the scene, "[I]t looks like you might be the victim here." Mahuna Dep. 28:25-29:1.

Sergeant Halliburton also opened the back of the police car and repeated that Officer

Besner only needed a statement from Hartfield before Hartfield could go. Hartfield refused to

speak without an attorney present and swore at Sergeant Halliburton.

Officer Besner "informed Sergeant Mahuna that I was going to take Hartfield to North

Pct. pending further investigation." Moede Aff. Ex. 1, at 4. He drove Hartfield to the North

Precinct at 12:11 (approximately 30 minutes after arriving at the scene), pulled into the garage,

and transported Hartfield into a jail cell and left him with the handcuffs still on at 12:18. At

12:34, Officer Besner returned and asked for Hartfield's attorney's number. Officer Besner left,

then returned at 12:47 and told Hartfield that his attorney was on the way.  Officer Besner took

the handcuffs off, led Hartfield down the hall into an interview room, and asked him if he needed

medical attention, water, or to use the restroom.  Hartfield said he needed to use the toilet, so he

was returned to the cell.  When he was finished, Officer Besner escorted Hartfield back to the

interview room.  Once his attorney arrived, at 13:38, and Hartfield had an opportunity to speak

with him, Hartfield made a statement, and was allowed to leave immediately afterward, at 15:21.

Hartfield was not charged with a crime.

In the meantime, officers continued to interview witnesses.  Witnesses informed the

police that Bell came into Hartfield's consignment shop acting strangely.  Hartfield asked Bell to

leave several times.  When Bell refused, Hartfield asked his customers to leave the store, so no

witness saw how the fight began.  Hartfield attempted to physically remove Bell from the store

and the two men fell out the front door of the store together.  Bell had a knife in his hand.  At one

point, a man mistook Hartfield as the aggressor and tried to subdue him.  Bystanders successfully

pried the knife out of Bell's hand.  At some point, 9-1-1 was called.  When the police arrived,

Hartfield had subdued Bell and the two were no longer fighting.  Officer Pryce wrote in his notes

that witness MacKay told him she saw the gun in Hartfield's hand pointed at the "head of the

blue suit [Bell]."  Moede Aff. Ex. 15, at 2; Ex. 16, at 3.

At the precinct, Hartfield told police that he asked everyone to leave the shop, considered

pulling his gun but decided not to, but tried to get Bell to leave the shop.  Bell then pulled a knife

out of his pocket, which is when Hartfield grabbed Bell's hand holding the knife and tried to get

him out of the store.  Bell wedged his foot against the door jam and then against a support pole.

Hartfield was able to push him out on the sidewalk where Bell fell on top of him.  After

Page 8 - OPINION AND ORDER

witnesses were able to pry the knife from Bell's hand, Hartfield flipped Bell over and the gun

flew out of Hartfield's holster.  A witness tried to pull Hartfield from Bell, but when bystanders

and Hartfield yelled that he was the owner of the store, the man let him go.  Hartfield subdued

Bell just before the police arrived.  Hartfield testified that Officer Besner was "pretty cool, calm.

He didn't react to me yelling, other than to stay calm and cool and get out the car."  Hartfield

Dep. 82:14-16.  Hartfield confirmed Officer Besner was "calm and professional the whole time.

There's no question at all."  Id. at 91:10-11.

## DISCUSSION

I.    Fourth Amendment Violation:  Whether There was Probable Cause to Arrest

Hartfield alleges Officer Besner did not have probable cause to arrest him.[3]  Defendants

first assert Officer Besner did not arrest Hartfield, he only detained him, and secondly, he had

probable cause to arrest Hartfield.

A.    Whether Officer Besner Arrested or Detained Hartfield

Defendants argue that what happened to Hartfield was a mere detention; Hartfield claims

it was an arrest.

There are three types of police stops under the Fourth Amendment.  First, police may stop

a citizen for questioning at any time, so long as a reasonable person would feel free to leave.

Florida v. Bostick, 501 U.S. 429, 434 (1991).  Such brief, "consensual" exchanges need not be

supported by a reasonable suspicion that the citizen is engaged in wrongdoing, and such stops are

not considered seizures.  Second, the police may "seize" citizens for brief, investigatory stops.

---

[3]The First Amended Complaint alleges this claim against all defendants, but Hartfield's
briefing is directed at Officer Besner.  Accordingly, I dismiss this claim against Sergeant
Mahuna.

This class of stops is not consensual, and such stops must be supported by "reasonable suspicion," a lower standard than probable cause. Terry v. Ohio, 392 U.S. 1, 20-22 (1968). Finally, police stops may be full-scale arrests. These stops are seizures and must be supported by probable cause. Whiteley v. Warden, 401 U.S. 560, 564-66 (1971) (same probable cause standard applies for arrest warrant or warrantless arrest).

Defendants contend they never arrested or charged Hartfield with any crime. Furthermore, because Hartfield was involved in a fight where a gun and a knife were present, Officer Besner had reasonable suspicion to detain him to investigate the circumstances of the altercation. Because Hartfield requested an attorney, defendants argue, the police needed to transport him to the precinct to fulfill the request.

There is no factual dispute that Officer Besner had reasonable suspicion to detain Hartfield; the real issue is whether the detention ripened into an arrest. To determine whether an investigative stop has ripened into an arrest, the totality of the circumstances must be considered. United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990). Both the intrusiveness of the stop, namely the aggressiveness of the police methods, and the restrictions on the suspect's liberty are examined. Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996). Factors include: (1) if the suspect was held at gunpoint; (2) if the suspect was handcuffed; (3) if the suspect was ordered to lie face down on the ground; (4) if the suspect cooperated; (5) the length of the stop; (6) the number of officers; (7) if the suspect was held in the police car; (8) if the police have information that the suspect might be armed; (9) if the stop closely follows a violent crime; and (10) if the police have information that a violent crime is about to occur. Del Vizo, 918 F.2d at 824-25; Washington, 98 F.3d at 1186-88. No single factor is dispositive. The officer may "take

reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed." Del Vizo, 918 F.2d at 825.

Many of the factors identified above are present. Nevertheless, as an initial matter, the fact that Officer Besner placed Hartfield in handcuffs, patted him down and disarmed him so that he was no longer a safety risk does not automatically convert a Terry stop into an arrest. Gallegos v. City of L.A., 308 F.3d 987, 991 (9th Cir. 2002) (not automatically an arrest when officers draw their guns or use handcuffs); Alexander, 64 F.3d at 1320 ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable."). Officer Besner knew from dispatch that there "may be a gun involved somehow," that "the subject with the gun is a black male, light blue button-down shirt and blue jeans," and that Hartfield matched the description of the "subject with the gun." Moede Aff. Ex. 13, at 7. He also heard Bell yell that Hartfield had a gun. Under these circumstances, there is no question of fact that Officer Besner merely detained Hartfield to remove the gun, and that he acted lawfully in doing so, when he placed Hartfield in handcuffs, patted him down and disarmed him.

I do note, however, that Officer Besner's decision to place Hartfield in the police car could constitute an arrest. It is true there is "no per se rule that detention in a patrol car constitutes an arrest," Gallegos, 308 F.3d at 991 (citing United States v. Parr, 843 F.2d 1228, 1231 (9th Cir. 1988)), and when Officer Besner was faced with an individual who had been fighting only moments before, and when police needed to confirm that the gun was properly licensed and needed to speak with witnesses at the scene to determine whether there was a reason

Page 11 - OPINION AND ORDER

to arrest Hartfield, placing Hartfield in the back of the police car for fewer than 20 minutes[4] may not constitute an arrest.  See Halvorsen v. Baird, 146 F.3d 680, 684 (9th Cir. 1998) (one factor is whether "police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant").  However, since Hartfield was no longer armed, and since he fully complied with all of Officer Besner's instructions, made no indication he would flee, at least four officers were on the scene, and Officer Besner was not himself speaking with any witnesses, placing Hartfield in the back of a patrol car could constitute an arrest.  United States v. Ricardo D., 912 F.2d 337, 340 (9th Cir. 1990) (unarmed juvenile placed in back of patrol car for questioning constituted arrest); cf. United States v. Manbeck, 744 F.2d 360, 377-78 (4th Cir. 1984) (inclement weather provided no other alternative to questioning in police car).

It is also true that "[m]oving a suspect from one location to another does not automatically turn a detention into an arrest, *where reasons of safety and security justify moving the person*."  Halvorsen, 146 F.3d at 685 (emphasis added); see also United States v. Charley, 396 F.3d 1074, 1080 n.4 (9th Cir. 2005) (listing cases).  However, courts have concluded that "a distinction between investigatory stops and arrests may be drawn at the point of transporting the defendant *to the police station*."  Parr, 843 F.2d at 1231 (emphasis added) (citing, among others, Hayes v. Florida, 470 U.S. 811, 816 (1985) (line between investigatory detention and arrest is crossed when police transport suspect to police station without consent and fingerprint him);

---

[4]Hartfield testified he thought he was in the police car for 20 to 30 minutes, but dispatch records show Officer Besner arrived on the scene at 11:51 and Hartfield was transported at 12:11. Moede Aff. Ex. 3.  Defense counsel reports Hartfield was handcuffed and seated in the patrol car at 11:58:13, but I am unable to find support for that time in the cited exhibits.

Dunaway v. New York, 442 U.S. 200, 216 (1979) (arrest occurs when suspect is seized and transported to the police station and placed in a cell or interrogation room);  Gonzalez v. City of Peoria, 722 F.2d 468, 477 (9th Cir. 1983) (defendant is arrested when transported to police station and placed in cell or interrogation room even if the purpose of the seizure is investigatory rather than accusatory)); see also Kaupp v. Texas, 538 U.S. 626, 630 (2003) ("involuntary transport to a police station for questioning is 'sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause").  Officer Besner offers no explanation for why Hartfield's attorney could not be contacted to appear at the store, and there is no evidence Hartfield consented to go to the precinct to meet his attorney.  Based on the facts presented by plaintiff, and the holdings of these cases, I cannot find that Hartfield was merely detained and not arrested when he was unwillingly transported to the precinct, placed in a cell, and then in an interview room awaiting his counsel.

In their reply, defendants rely on a case neither party cited in the earlier briefs, Thomas v. City of Portland, Civ. No. 05-1059-ST, 2007 WL 2286254 (D. Or. Aug. 3, 2007).  In that case, Judge Stewart concluded, as a matter of law, it was not an arrest to place a reportedly armed man, who resisted arrest, in handcuffs and in the back of a police car while an investigation took place. Judge Stewart concluded the investigatory stop turned into an arrest only after the officers had interviewed witnesses and spoken to the suspect at the precinct.  Not only are the facts distinguishable–in that Hartfield was not resisting arrest–Judge Stewart also did not address the cases I have cited above–concluding transport to the police station is a proper line to draw in determining when a stop evolves into an arrest.

Page 13 - OPINION AND ORDER

In sum, "[t]he evidence is sufficient to raise a jury question regarding when the conduct of the . . . officers evolved from a stop into an arrest." Choi v. Gaston, 220 F.3d 1010, 1012 (9th Cir. 2000) (per curiam). As a result, because an issue of fact remains as to whether confinement in the police car or transporting Hartfield to the precinct changed the stop into an arrest, I deny defendants' motion for summary judgment as to Officer Besner on this issue.

B.    Whether Officer Besner had Probable Cause to Arrest Hartfield

Even assuming the events could be characterized as an arrest, defendants assert they had probable cause to arrest Hartfield. A warrantless arrest is reasonable under the Fourth Amendment when there is probable cause to believe that a criminal offense has been or is being committed. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. Id. (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003)). The court must look to "the totality of the circumstances known to the arresting officer, to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime." John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008) (internal brackets omitted). "[T]he collective knowledge of all the officers involved in the criminal investigation" is relevant. Harper v. City of Los Angeles, 533 F.3d 1010, 1022 (9th Cir. 2008). Additionally, "[p]robable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." John, 515 F.3d at 940; Devenpeck, 543 U.S. at 153 (cases make clear that arresting officer's state of mind is irrelevant, except for the facts that he knows; question is whether circumstances viewed objectively justify the action). The court makes this

Page 14 - OPINION AND ORDER

determination "based upon the information the officer had at the time of making the arrest."

John, 515 F.3d at 940.  Finally, "[w]here the facts or circumstances surrounding an individual's

arrest are disputed, the existence of probable cause is a question for the jury."  Harper, 533 F.3d

at 1022.

Defendants argue that Officer Besner had probable cause to arrest Hartfield for Disorderly

Conduct in the Second Degree in violation of ORS 166.025(1)(a), Menacing in violation of

ORS 163.190 or Assault in the Second Degree in violation of ORS 163.175.

From the police perspective, Sergeant Mahuna put it best in responding to Hartfield's

deposition questions:

> When you [Hartfield] were refusing to be interviewed, you wanted a
> lawyer, and Mr. Bell refused to be interviewed, he also wanted a lawyer, we were
> kind of stuck.  We have a situation where we have a fight where we have someone
> involving a gun and someone involving a knife and no witnesses to the beginning
> of this fight because you guys were alone in the store.  So the only witnesses to
> the actual interactions inside the store are you two guys.
>
> If we'd had third-party information, like if the fight had taken place in the
> store and all the customers were inside and they could tell us what happened, that
> would be great.  We didn't have that.
>
> So I decided, well, you know what, we have to – this is kind of a major
> deal.  This could be a big deal.  We have someone menacing with a firearm,
> someone menacing with a knife, no visible injuries but a problem there anyway
> and so we decided to try and contact your lawyers.

Mahuna Dep. 26:5-21.

Nevertheless, Hartfield has raised an issue of fact about whether Officer Besner could

arrest him on an assault charge.  The statute, ORS 163.175, requires "intentionally or knowingly"

causing "physical injury to another" or "recklessly" causing "serious physical injury to another by

means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to

Page 15 - OPINION AND ORDER

the value of human life."  Officer Besner had no knowledge that Hartfield had caused "physical

injury" to another.  Just the opposite, in fact.  Officer Besner knew no one had been stabbed or

shot, and that no paramedics were needed.  He could also see that there were no serious injuries.

Indeed, the only injury he noted was "a visible cut on [Hartfield's] upper lip."  Moede Aff. Ex. 1,

at 4.

As for the disorderly conduct charge, the question is whether Officer Besner could

conclude there was a fair probability Hartfield intentionally or "recklessly creat[ed] a risk" of

"caus[ing] public inconvenience, annoyance or alarm" by "engag[ing] in fighting or in violent,

tumultuous or threatening behavior."  ORS 166.025(1)(a).  "Recklessly" is defined to mean,

> a person is aware of and consciously disregards a substantial and unjustifiable risk
> that the result will occur or that the circumstance exists.  The risk must be of such
> nature and degree that disregard thereof constitutes a gross deviation from the
> standard of care that a reasonable person would observe in the situation.

ORS 161.085(9).

Officer Besner knew from witness statements he read and from talking with Sergeant

Mahuna and Officer Edner, before he took Hartfield to the precinct, that Hartfield owned the

store, that witnesses had seen Bell come into the store, that Hartfield had asked Bell to leave the

store, and that Bell refused to leave.  McKay testified she remembers telling Officer Besner at

some point, and probably at the time Officer Besner handcuffed Hartfield, that Hartfield was the

owner, the "good guy," and that the other "bad guy" was the "one that attacked" Hartfield.

McKay Dep. 16:20-24; see also Hartfield Decl. ¶ 11 (same recollection).  Hartfield testified he

told Officer Edner right away, "I own this store, and he [Bell] refused to leave, then assaulted me

with a knife." Hartfield Decl. ¶ 6. Officer Edner's report did not indicate that either Bell or any

witness on the scene disputed Hartfield's comment.

Sergeant Mahuna testified there was probable cause to arrest Hartfield based on the

possibility Hartfield had pulled a gun on Bell. Mahuna Dep. 45:6 (" I'm drawing conclusions

from things that I'm hearing on the radio that a gun is out"). However, the only witness who said

she saw a gun in Hartfield's hand was McKay, and Officer Pryce did not speak with her until

after Officer Besner took Hartfield to the precinct.[5] Similarly, I do not rely on the fact that a

bystander tried to pull Hartfield off of Bell, mistaking Hartfield as the one who needed subduing,

as this was also a fact officers did not learn until after Officer Besner transported Hartfield to the

police station. In addition, Sergeant Mahuna testified that he told Hartfield it looked like

Hartfield might be the victim. Indeed, Magauran told Officer Edner she stuck around because

she was concerned about Hartfield's safety. In short, looking at the facts in the light most

favorable to Hartfield, at the time Officer Besner put Hartfield in the car, or took him to the

precinct, the police only had a suspicion that Hartfield had pulled a gun on Bell and that people

were concerned about it. United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007) ("mere

suspicion, common rumor, or even strong reason to suspect . . . are not enough"). Hartfield has

---

[5]In any event, there is a dispute about McKay's statement as she has now testified she
never said she saw Hartfield point a gun at Bell's head. Instead, she testified that when a
bystander tried to pull Hartfield off, he "had somehow–he pulled out a gun. And at that point, I
didn't know where it came from." McKay Dep. 12:3-4. That was the first time she saw the gun,
when the bystander was holding it up like it was a dirty diaper. Brook Graham also testified that
she just saw the gun appear–"I wasn't clear at all where that came from." Graham Dep. 1:5-6.
She thought she saw it in a hand, but she could not say who was holding it.

raised a question of fact whether what Officer Besner knew was sufficient to constitute probable cause.

Hartfield additionally raises a question of fact about whether the officers could arrest him on a menacing charge. Specifically, with respect to menacing, ORS 163.190 requires that, "by word or conduct," a person "intentionally attempts to place another person in fear of imminent serious physical injury." Looking at the facts in the light most favorable to Hartfield, there is a question whether Officer Besner had any knowledge that Hartfield had the specific intent to place Bell or anyone else in fear of imminent serious physical injury. All dispatch had reported was that "there may be a gun involved somehow." Moede Aff. Ex. 13, at 7. Officer Besner obtained the gun from Hartfield's holster. At the time Officer Besner placed Hartfield in the patrol car, and later transported Hartfield to the precinct, no witnesses had reported Hartfield holding a gun. Hartfield and at least one other witness had indicated Hartfield had been the victim, and Sergeant Mahuna seemed to concur. Bell refused to speak. The officers did not have enough information to conclude with a "fair probability" that Hartfield had committed the crime of menacing. See Lopez, 482 F.3d at 1072 ("mere suspicion, common rumor, or even strong reason to suspect . . . are not enough").

In sum, because "reasonable persons might reach different conclusions on the facts," whether there was probable cause to arrest Hartfield is a question for the jury. Graves v. City of Coeur D'Alene, 339 F.3d 828, 845 (9th Cir. 2003), abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177 (2004). Since a question of fact exists as to whether Officer Besner had probable cause to arrest Hartfield, defendants' motion for summary judgment on this issue is denied.

II.    Right to Counsel and Silence

Hartfield argues he insisted on an attorney, but that Officer Besner and Sergeant Mahuna refused to comply with his request and continued to interrogate him in violation of his Fifth Amendment rights. He acknowledges that he made no statement that is being used against him.

Defendants point out that the Supreme Court has held coercion in interrogation does not violate the Fifth Amendment unless the compelled statement is used in a criminal case. Chavez v. Martinez, 538 U.S. 760, 766-67 (2003); see also Siwiec v. Thompson, No. CV 02-454-ST, CV 02-460-ST, 2004 WL 2480516, at *18 (D. Or. Nov. 3, 2004) ("touchstone of a Fifth Amendment claim is the later use of an incriminating statement by the defendant while in custody"); Crowe v. Cnty. of San Diego, 608 F.3d 406 (9th Cir. 2010).

Hartfield responds by suggesting an extension of the law. Alternatively, he requests an opportunity to amend his complaint to allege a violation of his substantive due process rights. He refers to his initial Complaint in which he alleged defendants engaged in outrageous conduct in retaliation for Hartfield's invocation of his rights to counsel and silence; he would also include in an amended complaint an allegation that defendants handcuffed him in his cell so he was unable to use the toilet, in retaliation for invoking his Fifth Amendment rights.

The case law defendants cite is very clear; Hartfield is not entitled to bring a § 1983 claim for damages against the police for violation of his rights to silence and counsel when they did not use statements against him in a criminal proceeding. Indeed, he did not even make a statement that could be used against him.

Furthermore, I do not give Hartfield permission to amend his complaint since a substantive due process claim would be fruitless. The Due Process Clause of the Fourteenth

Amendment protects against government conduct that "shocks the conscience." Chavez, 538

U.S. at 774.  Nothing Hartfield alleges comes close to that standard.  Officers asked him on two

separate occasions whether he wanted to speak with the police (after he had requested an

attorney), but there is no evidence either of the officers knew he had invoked his right to counsel.

Even according to Hartfield's own testimony, they were both very polite in speaking with him.

With respect to his inability to use the toilet, he never asked to use it, and Officer Besner offered

its use fewer than 30 minutes after Hartfield's arrival at the North Precinct.  Although the

Supreme Court has suggested police torture to coerce a confession might rise to the "shocks the

conscience" level, thus triggering a due process violation, Hartfield falls far short of that high

standard.  Id. at 773.

    Hartfield's third claim for relief is dismissed.

III.    Supervision

    Hartfield claims Sergeant Mahuna saw Officer Besner arrest Hartfield, "knew of [Officer

Besner's] history of using unreasonable force to effectuate arrests and of making arrests without

probable cause," and knew Hartfield had not committed a crime at the time he was arrested.  Pl.'s

Resp. 37.

    Liability under § 1983 arises only upon a showing of personal participation by the

defendant in the alleged constitutional deprivation.  Ortez v. Washington Cnty., 88 F.3d 804, 809

(9th Cir. 1996).  There is no respondeat superior liability under § 1983.  Monell v. N.Y.C. Dep't

of Soc. Servs., 436 U.S. 658, 691-94 (1978).  Typically, "[a] supervisor is only liable for

constitutional violations of his subordinates if the supervisor participated in or directed the

violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Defendants assert that Hartfield cannot point to any evidence demonstrating Sergeant Mahuna was aware of information indicating a lack of probable cause to arrest Hartfield, and there is no evidence in the record that Sergeant Mahuna knew about any arresting history of Officer Besner.

I agree with defendants about Officer Besner's arrest history; Hartfield has no evidence indicating Sergeant Mahuna knew of any problems with Officer Besner. However, unless he is entitled to qualified immunity, because Sergeant Mahuna was on the scene, investigating witnesses, conversing with Officer Besner about the case, and may have been involved in the decision to transport Hartfield to the precinct, a material issue of fact remains as to whether he should be liable. Mahuna Dep. 29:1 (told Hartfield, "It looks like you might be the victim here"); Mahuna Dep. 26:21 ("we decided to try and contact your lawyers"); Larez v. City of L.A., 946 F.2d 630, 646 (9th Cir. 1991) ("set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew, or reasonably should have known, would cause others to inflict the constitutional injury").

IV.   False Imprisonment

Hartfield alleges defendant "City of Portland" unlawfully detained and transported him without probable cause. The claim asserts "[t]he actions by Besner and other officers in unlawfully detained [sic] and transporting Plaintiff without just cause or probable cause constitutes false imprisonment as those actions were taken without legal authority and were against Plaintiff's consent." First Am. Compl. ¶ 71. The briefing is directed at Officer Besner.

Page 21 - OPINION AND ORDER

Probable cause is a complete defense to a false imprisonment allegation.  Bacon v. City of Tigard, 81 Or. App. 147, 724 P.2d 885 (1986).

As I have set forth above, Hartfield has successfully raised an issue of fact about whether any confinement was lawful.  As a result, Officer Besner is not entitled to judgment on this claim.

V.      Qualified Immunity

Defendants move for qualified immunity.  The court applies a two-prong test to evaluate whether officers are entitled to qualified immunity.  The first question is whether the plaintiff has alleged facts showing the officer violated a constitutional right, and the second question is whether that right was clearly established at the time of the event.  Ashcroft v. al-Kidd, ___ U.S. ___, 131 S. Ct. 2074, 2080 (2011).  "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Friedman v. Boucher, 580 F.3d 847, 858 (9th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)).  Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  If the officers' conduct falls in the "hazy border" between lawful and unlawful conduct, the officer is entitled to qualified immunity.  Id. at 201.

On the first prong, Hartfield has pled a Fourth Amendment violation–that he was arrested without probable cause–as set forth above.

With respect to the second prong–whether the right was clearly established–I must divide the analysis into two parts.  I first find that it was "not clearly established law that placement of a

suspect in a patrol car exceeds the bounds of a permissible investigative stop." Alexander, 64

F.3d at 1320. Here, where the officers had a reasonable justification to investigate the

circumstances of the fight, the officers are entitled to qualified immunity on the decision to place

Hartfield in the back of the patrol car. However, given the multiple case citations set forth

above, it was clearly established that transporting a suspect to the precinct for questioning

constitutes an arrest requiring probable cause. See, e.g. Parr, 843 F.2d at 1231.

Accordingly, the next inquiry is whether, assuming Officer Besner arrested Hartfield

without probable cause when he transported Hartfield to the precinct, he and Sergeant Mahuna,

as his supervisor, are nevertheless entitled to qualified immunity. Even absent probable cause,

"[t]he critical inquiry . . . is whether a reasonable police officer could have believed that his or

her conduct was lawful, in light of clearly established law and the information he or she

possessed at the time." Fuller v. M.G. Jewelry, 950 F.2d 1437, 1443 (9th Cir. 1991); see also Act

Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) ("[T]he question of whether a

reasonable officer could have believed probable cause . . . existed to justify a search or an arrest

is 'an essentially legal question."). However, "summary judgment based on qualified immunity

should be denied if under the plaintiff's version of the facts the officer could not reasonably

believe his conduct was lawful." Knox v. Southwest Airlines, 124 F.3d 1103, 1108 (9th Cir.

1997).

Even accepting plaintiff's version of the facts, as I am required to do, I find a reasonable

officer might conclude there was probable cause to arrest Hartfield on a charge of disorderly

conduct. In order to meet the elements of that offense, police had to have a fair probability that

Hartfield intentionally or recklessly created a risk of causing public inconvenience, annoyance or

alarm by engaging in fighting.  There is no question he was fighting.  The question is whether he intentionally or recklessly (i.e. disregarded a substantial and unjustifiable risk) caused public inconvenience, annoyance or alarm.

Police officers were called to a fight with a gun and a knife; people were obviously concerned enough to call 9-1-1.  Hartfield, reported to be the guy with the gun, did indeed have the gun on him.  Other than his initial statement to Officer Edner that he owned the store and Bell had assaulted him with a knife, he would not speak up about what happened.  Officers could reject Hartfield's single statement at the scene (or take it with a grain of salt).  Furthermore, officers could appropriately question McKay's statement that Hartfield was the victim since she did not see the beginning of the fight in the store.  Finally, all the officers who were asked about probable cause in depositions testified there was probable cause to arrest Hartfield for disorderly conduct.  In sum, I find a reasonable police officer could have believed that his conduct was lawful.  Officer Besner and Sergeant Mahuna, as his supervisor, are entitled to qualified immunity.

## CONCLUSION

Defendants' Motion for Summary Judgment [26] is moot.  Defendants' Motion for Summary Judgment Regarding Plaintiff's First Amended Complaint [48] is granted in part and denied in part, as follows:

All claims against Sergeant Halliburton are dismissed with prejudice;

Hartfield's Second Claim for Relief (Unreasonable Force), Third Claim for Relief (Violation of the Fifth Amendment) and Sixth Claim for Relief (Battery) are dismissed with prejudice;

Page 24 - OPINION AND ORDER

Officer Besner and Sergeant Mahuna are entitled to judgment on their Third Affirmative

Defense of qualified immunity.  As a result, the First Claim for Relief (Fourth Amendment

Violation) and the Fourth Claim for Relief (Failure to Supervise) against them are dismissed with

prejudice.

The parties are directed to confer and propose a schedule on the Fifth Claim for Relief

(bifurcated Monell claim) within 14 days of this Opinion and Order.  Unless otherwise informed

by the parties, the November 6, 2012, trial remains scheduled on Hartfield's Seventh Claim for

Relief (False Imprisonment) against Officer Besner only.

IT IS SO ORDERED.

DATED this ____9th____ day of July, 2012.


/s/ Garr M. King_____
Garr M. King
United States District Judge